BROUWERS v. ALLIED PAPER MILLS.

1. APPEAL AND ERROR—EQUITY—EVIDENCE.
    On appeal from decree dismissing plaintiff's bill to cancel certificate of stock, to require reissue of half of the number of shares to her and for accounting for dividends paid defendant pledgee after he had caused stock owned by plaintiff and her late husband as tenants in common to be transferred to pledgee, plaintiff's apparent attitude as a witness and the contradiction in testimony given by her which was evidently discredited by judge *held*, to justify construction of her testimony in the light most unfavorable to her.

2. ESTOPPEL—INDORSEMENT ON CERTIFICATE OF STOCK—PLEDGES—EVIDENCE.
    In suit to cancel certificate of stock and require reissue of half of the number of shares to plaintiff and for accounting for dividends paid pledgee of original stock, owned by plaintiff and her late husband as tenants in common and pledged by latter as security for his personal note which was never paid, evidence which showed that, notwithstanding plaintiff did not herself indorse original stock her name had been placed thereon beneath that of her husband's and that before original stock was caused to be transferred and reissued in name of pledgee, plaintiff knew the certificate purported to be indorsed by her and that pledgee was relying upon it as *bona fide* collateral over period of years after she had signed one of the renewal notes *held*, to estop her from asserting she was not bound by the indorsement.

Appeal from Kalamazoo; Weimer (George V.), J. Submitted January 13, 1938. (Docket No. 18, Calendar No. 39,780.) Decided April 4, 1938.

Bill by Dean Brouwers against Allied Paper Mills, a Michigan corporation, Holland State Bank and

William J. Westveer to cancel a stock certificate, for an injunction, accounting and other relief. Bill dismissed. Plaintiff appeals. Affirmed.

*Annis & Cooper,* for plaintiff.

*Diekema, Cross & Ten Cate,* for defendants Holland State Bank and Westveer.

NORTH, J.  Plaintiff filed a bill of complaint asking that stock certificate No. 2,147 for 200 shares of the Allied Paper Mills, now in the name of William Westveer as one of the trustees for the segregated assets of the First State Bank of Holland, Michigan, be canceled and that a certificate for 100 shares of this stock be issued to her. She also asks for an accounting for dividends paid to the trustees. The defendant Holland State Bank has succeeded to and possesses some of the assets formerly held by the First State Bank of Holland. A decree was entered in the circuit court dismissing the bill of complaint, and plaintiff has appealed.

In August, 1926, the Wolverine Furniture Company was indebted on promissory notes to the First State Bank in the amount of $9,000. This indebtedness was canceled by the payment of $1,000 in cash and by each of the four indorsers on the furniture company notes giving to the bank his personal note for $2,000. Sikke Brouwers, one of the indorsers and husband of plaintiff, executed his note for $2,000 and delivered it to the bank September 14, 1926. March 8, 1927, $250 was paid on this note, and for the balance of the obligation a note for $1,750 was executed by plaintiff and her son-in-law, Mr. Eli Cross. Thereafter until August 26, 1930, renewal notes were signed every six months by Sikke Brouwers. Al-

though plaintiff at the trial denied remembering her part in the execution of the $1,750 note, still her testimony is not at all convincing. Portions of it indicate she knew all about the transaction. But in other portions she denies any knowledge concerning it. This note, presumably having been returned to either Mr. or Mrs. Brouwers, was not produced at the hearing.

When the $2,000 note was given to the bank by Sikke Brouwers he turned over as collateral a stock certificate issued January 6, 1922, to S. and D. Brouwers, representing 200 shares in the Allied Paper Mills. This stock was issued prior to the enactment of our present statutory provision governing the character of ownership of stock issued to a husband and wife (3 Comp. Laws 1929, § 13071); and counsel concede that plaintiff and her husband held this stock as tenants in common. When the certificate was delivered to the bank as collateral it bore the signature of Sikke Brouwers and under his signature appeared the name "D. Brouwer." The testimony does not show who placed "D. Brouwer" on the certificate. Plaintiff denies having signed it. So far as appears from the testimony the bank officers did not know who wrote the signature "D. Brouwer" upon the certificate. It came to the bank as collateral to Sikke Brouwers' note in the regular course of business and the genuineness of the indorsement was not questioned. Neither Mr. nor Mrs. Brouwers had previously done business with the bank and hence the signature "D. Brouwer" was not recognized at the bank as being or not being that of plaintiff. In passing upon this phase of the case the trial judge said:

"Plaintiff's denial of the indorsement of the certificate, exhibit A, supported as it is by other ex-

hibits containing her undoubted signatures, satisfies me that her apparent signature on exhibit A is not genuine. But that is not the whole story. She seeks equitable relief and must satisfy all the applicable maxims and rules. Is she estopped or otherwise precluded from receiving the relief sought?''

Mrs. Brouwers testified that she and her husband held stock jointly in the Wolverine Furniture Company and that her husband ''looked after the interests'' of himself and plaintiff ''mostly.'' Previous to the transaction here in suit Mr. and Mrs. Brouwers had owned two other certificates of stock in the Allied Paper Mills, No. 670 for 126 shares and No. 668 for 200 shares. The first of these two certificates was sold to the son-in-law and was indorsed by both plaintiff and her husband; but plaintiff seems to have had no information concerning the ownership of the other certificate and she did not indorse it at the time it was sold.

The testimony is uncertain as to when plaintiff first learned about the pledge of the stock here in suit, but she sets the time as either in 1927 or 1928. She testified that she knew of it when the $250 was paid on the note in 1927. That was at the time that the first renewal note was executed by plaintiff and her son-in-law. However, plaintiff asserts that the first time she knew that her purported signature was on the certificate was when she went to the bank after her husband's death. This was in 1933 and she asked at the bank that she be permitted to see the certificate. She testified that she then told the bank officer, Mr. Wickers, that the indorsement on the certificate ''D. Brouwer'' was not her signature. Mr. Wickers testified that he had no recollection of plaintiff having so stated. In 1936 plaintiff first learned that the stock in question had been trans-

ferred to William Westveer. Notwithstanding plaintiff admits knowledge of the challenged indorsement in 1933, she took no action until this suit was started in January, 1937. In this connection she testified that she did not think the bank could sell this stock because "I didn't sign it."

The circuit judge in granting a decree dismissing plaintiff's bill of complaint planted decision on the ground that plaintiff was estopped from now asserting that she is not bound by the indorsement "D. Brouwer." Plaintiff's apparent attitude as a witness and the contradiction in testimony given by her seriously challenge her integrity. The trial judge evidently discredited her testimony. Under such circumstances this court on appeal is fully justified in construing her testimony in the light most unfavorable to her. With this in mind we quote a portion of plaintiff's testimony:

"*Q.* And you knew of his (plaintiff's husband) having stock ownership in the Wolverine Furniture Company of Zeeland, didn't you?

"*A.* I do.

"*Q.* Did you hold stock in there too?

"*A.* Yes. It was jointly, I guess, so far as I know.

"*Q.* But he handled these matters relating to his affairs and yours, all your interests or joint interests in that institution, didn't he?

"*A.* Well, I don't know what to say as to that.

\* \* \*

"*Q.* You didn't have anything to do with the management of your interests or his in connection with that company, did you?

"*A.* Not at all.

"*Q.* You left that to him, didn't you?

"*A.* My husband and I always got along well together. I considered him honest. He always dealt fairly with me and other people.

"*Q.* You don't know of anything irregular or dishonest in the handling of his matters with the First State Bank, do you?  *  *  *

"*A.* No, I don't.  *  *  *

"*Q.* You knew at the time of the settlement that was made with the First State Bank when they took over Brouwers' note for $2,000 with this stock as collateral, didn't you?

"*A.* No, I didn't.

"*Q.* Didn't he ever tell you  *  *  *  about that note?  *  *  *

"*A.* Not at the time. He did later during his lifetime.

"*Q.* He told you that he had left this certificate with the bank as collateral to that note, didn't he?

"*A.* I didn't never get that out of his mouth.

"*Q.* How did you learn that then?

"*A.* At the time that  *  *  *  Mr. Brouwers had $250 on deposit in the Zeeland State Bank, and  *  *  * the directors of the Holland State Bank held a meeting on a Monday night, and they found out, I guess, that he had collateral in that bank in Zeeland, so they thought that they should have more security and then, of course, that came out.

"*Q.* And that was the first time that you knew that this certificate  *  *  *  was up as collateral with that note?

"*A.* Positively.  *  *  *

"*Q.* And you knew that the reason why you didn't have this particular certificate in your possession was because that was up with the bank continuously as security, didn't you?

"*A.* Yes, sir.

"*Q.* And you never had any objection to that stock being at the bank as collateral, did you?

"*A.* No, I didn't because I knew it was my husband's doings.  *  *  *  I went (after my husband's death) to the bank and I had notice and I told them that I was very willing, but I was unable to pay. I knew at that time, that they would hold the collateral

there until the note was paid. I had no objection to that. If I had the money it would have been paid. I didn't have the money to pay it.   *   *   *

"*Q.* And Mrs. Eli Cross (plaintiff's daughter) knew about this matter of this collateral being up with the bank at the time that her husband and you signed that renewal note that was dated February 28, 1927, didn't she?

"*A.* Yes."

We can arrive at no other conclusion than that at the time plaintiff and her son-in-law gave the bank their note of $1,750 in lieu of her husband's $2,000 note, on which the $250 was paid, she knew the stock was pledged as collateral to this note. Unless she was then bound by the pledge of this stock the $1,750 note given by herself and her son-in-law was evidently without proper collateral so far as either of them were concerned. It is a serious tax upon credulity to believe that any of the parties to the transaction had any other thought or intention at that time than that the whole 200 shares represented by this certificate was pledged to secure payment of plaintiff's $1,750 note. As before noted, the certificate purported to be indorsed by plaintiff. The bank certainly was justified in holding it as her collateral as well as that of her husband. The bank continued to carry the loan. Repeated renewals over a period of years followed without change in the collateral. It was still held by the bank at the time Mr. Brouwers died. Notwithstanding her testimony to the contrary, we think the record discloses that Mrs. Brouwers knew, at least from the time she signed the $1,750 note, that the bank was relying upon the indorsed certificate of stock as *bona fide* collateral during the period of years through which it carried this loan. We are in full accord with the finding of the circuit judge who said:

"It is too much to ask this court to find affirmatively on this record that plaintiff was not fully aware of the entire situation in 1926 or 1927, or that this stock was pledged by her husband without her knowledge."

The decree entered in the circuit court is affirmed, with costs to appellees.

WIEST, C. J., and BUTZEL, BUSHNELL, SHARPE, POTTER, CHANDLER, and McALLISTER, JJ., concurred.